CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JAN 2 9 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

|  |  |  |
|---|---|---|
| **PAUL D. LAWSON,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08-cv-00024 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Paul D. Lawson, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Lawson's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C.A. §§ 405(g) and 1383(c)(3). (West 2003 & Supp. 2008).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more

than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lawson protectively filed his applications for SSI and DIB on December 1, 2004, (Record, ("R") at 18, 338-343, 470-472), alleging disability as of August 1, 2002, (R. at 18, 338-343), due to a back impairment with a herniated disc and diabetes mellitus. (R. at 19, 346-355.) The claims were denied initially, (R. at 322-327), and on reconsideration. (R. at 329-331, 475-477.) Lawson then requested a hearing before an administrative law judge, ("ALJ"), who held a hearing on July 25, 2006, at which Lawson was represented by counsel. (R. at 531-554.)

By decision dated October 17, 2006, the ALJ denied Lawson's claims. (R. at 18-25.) The ALJ found that Lawson met the insured status requirements of the Act for DIB purposes through October 17, 2006. (R. at 23.) The ALJ also found that Lawson had not engaged in substantial gainful activity since August 1, 2002, the alleged onset date. (R. at 23.) The ALJ found that Lawson suffered from a severe back impairment, diabetes mellitus and obesity. (R. at 23.) The ALJ found, however, that Lawson did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ found that Lawson retained the residual functional capacity,

2

("RFC"), to perform the exertional demands of a limited range of sedentary[1] work. (R. at 24.) Thus, the ALJ found that Lawson could not perform his past relevant work as a construction worker or machine operator. (R. at 19.) Based on Lawson's age, education, work history, residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the regional and national economies that Lawson could perform, including those of cashier, information clerk, order clerk, ticket seller, handle packager, sorter and assembler. (R. at 24.) Therefore, the ALJ concluded that Lawson was not under a disability as defined by the Act, and that he was not entitled to benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

After the ALJ issued his decision, Lawson pursued his administrative appeals, (R. at 14), but the Appeals Council denied his request for review. (R. at 8-10). Lawson then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.148 (2008). This case is before this court on Lawson's motion for summary judgment, which was filed on December 16, 2008, and on the Commissioner's motion for summary judgment, which was filed on January 12, 2009.

## II. Facts

Lawson was born in 1968, (R. at 338.), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c)

---

[1] Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a), 416.967(a).

3

(2008). Lawson has a high school education and past relevant work experience as a machine operator and a general laborer in the construction industry. (R. at 347, 350.)

Lawson testified that despite an alleged onset date of August 1, 2002, his last employment was in February 2001. (R. at 534.) When asked why he felt he was unable to work, Lawson testified that he had herniated discs in his lower back. (R. at 534.) He further testified that he was diabetic, noting that the condition was treated with medication. (R. at 534.) He also indicated that he had high blood pressure, poor circulation in his legs and kidney problems due to diabetes. (R. at 534.) Lawson explained that his back pain was constant, but that it varied from mild to excruciating at times. (R. at 535.) He noted that, due to his back pain, he experienced trouble sleeping, standing and sitting. (R. at 535.) He stated that it sometimes helps to get up and walk around, however, if he stands on his feet too much, it becomes painful. (R. at 535.) He stated that any "general movement" caused pain. (R. at 535.) He noted that slight movements such as sitting and turning wrong, or even coughing, could cause pain for several days. (R. at 536.) When that happens, Lawson described the pain as "a knot that comes up [his] lower back, about [his] beltline, and it will stay there for two or three days, even with the muscle relaxers and everything that [he is] on." (R. at 536.) Lawson testified that this type of excruciating pain occurred two to three times per week, but the pain may be more intense one week than it is the next. (R. at 536.)

When asked what measures Lawson took when this pain occurred, he replied "not a whole lot." (R. at 536.) He stated that he might use a heating pad or ice pack on occasion, or he might lie down on the couch and stretch out in order to relieve the pain.

4

(R. at 536.) With regard to his medication, Lawson stated that it helped a little, but not to the same degree that a painkiller would. (R. at 536.) Lawson testified that he was prescribed Ultracet and Flexeril, both of which slightly eased the pain, but neither medication eliminated it. (R. at 536-37.) He stated that the doctor's tried him on Lortab, which helped more than the other medications, however, he was told to discontinue because it can be addictive. (R. at 537.)

Lawson stated that the pain often radiated through his legs. (R. at 537.) He explained that, at first, he thought the pain caused numbness in his legs and feet, however, it was actually caused by his diabetes. (R. at 537.) He also stated that the pain radiated down the back of his legs into his calves. (R. at 537.) Lawson admitted that the next step for him would be to undergo surgery, but he stated that he could not afford it, noting that he did not have health insurance. (R. at 537-38.) Lawson further stated that his lack of health insurance had prevented him from certain recommended courses of treatment made by doctors. (R. 538.) Specifically, Lawson testified that doctors wanted to do additional x-rays on his back to determine whether it had either worsened or improved. (R. at 538.) Additionally, Lawson stated that doctors wanted to take x-rays of his hands and arms, in an attempt to identify the source of the numbness his upper extremities. (R. at 538.) He stated that his blood sugar had to be tested three to four times a week due to his diabetes, and each test strip costs one dollar, which he stated could add up over time. (R. at 538-39.)

Lawson testified that his back pain radiated into his legs two or three times a week. (R. at 539.) He further stated that the pain worsened in his legs after prolonged

5

periods of standing. (R. at 539.) Lawson stated that he also experienced numbness in his lower legs and feet, as well as from his elbows down to the tips of his fingers in both hands. (R. at 539.) Lawson stated at the time of his testimony that he was unable to feel anything in his right hand. (R. at 539.) Lawson explained that when he experienced numbness in his legs, it felt as though they are asleep, causing a tingling sensation with occasional swelling. (R. at 540.) Lawson attributed that the numbness to both his back pain and his diabetes. (R. at 540.)

With regard to his diabetes, Lawson stated that his blood sugar ranged from 70 and 80 on the low side to 250 on the high side. (R. at 540.) When asked why his blood sugar fluctuated so much, Lawson stated that he did not know. (R. at 540.) Lawson explained that he followed his recommended diet and took his medication properly, but noted that it still fluctuated. (R. at 540.) He also noted that the doctors considered increasing his medication. (R. at 540.) He further testified that, if he missed a meal, his blood sugar dropped, causing his head to hurt and causing him to become drowsy, grouchy and cranky. (R. at 541.) Lawson explained that, when his blood sugar was high, he experienced frequent urination and blurred vision to the point where he had trouble distinguishing things right in front of him. (R at 541.) Lawson testified that his frequent urination was also a result of doctors putting him on a fluid pill. (R. at 541.) Lawson noted that he had to urinate 15 to 20 times per day. (R. at 542.)

With regard to his sleep, Lawson stated that it was "almost non-existent." He further stated that he tried to get in bed around 10:00 or 11:00 p.m. each night, but due

6

to the pain, he was unable to fall asleep until around 2:30 or 3:00 a.m. He explained that gets up each morning around 8:00 or 9:00 a.m., resulting in, "[o]n average, about three to four hours [of] sleep a night." (R. at 542.) As a result of lack of sleep, Lawson explained that he experienced fatigue during the day, however, due to his back pain, he was unable to lie down and sleep during the day. (R. at 542.) Despite the pain, Lawson stated that he still lies down at times when the pain worsened in his lower back. (R. at 542.) Lawson stated that he lies down on the bed four to five times a day for 15 to 20 minutes. (R. at 542-43.) Lawson explained that he normally dealt with the pain in a variety of ways, indicating that lying on the bed was one way. (R. at 542.) He stated that sometimes he used a heating pad or an ice pack, and that he used pillows to elevate his legs. (R. at 543.) Lawson testified that he "tr[ied] a little bit of everything short of standing on [his] head." (R. at 543.)

Lawson testified that he had experienced issues with anxiety and panic. (R. at 543.) He noted that his anxiety and depression worsened when he discovered all of his medical ailments, such as his problems with his kidneys, liver, blood pressure and cholesterol. (R. at 543.) He testified that he wondered "[w]hy is this happening to me." (R. at 543.) He stated that not being able to work due to his back pain was depressing enough, but all of his other ailments on top of that made his depression much worse. (R. at 544.) Lawson explained that he did not like crowds, noting that he experienced a panic attack, he just wanted to be alone in his room. (R. at 544.) Lawson stated that his panic attacks were one reason that he did not "get out a whole lot." (R. at 544.) He stated that "[i]t's not so much that I have them, but I'm afraid that I will have them when I do get out." (R. at 544.) Lawson stated that he goes out

7

"maybe once a week." (R. at 545.) He stated that, if he goes out, he might go "to the post office where [his] mother works ... that would be about it. (R. 545.) Lawson stated that his symptoms during a panic attack consisted of stomach sickness, nervousness, sweating and sometimes headaches. (R. at 545.)

When asked to explain his depression in his own words, Lawson stated that he was "down on [himself]" and mad at himself "because [he] can't get out and do the things that [he] would like to do." (R. at 545.) He further stated that "[y]ou think everyone else is judging you and looking at you and [] talking behind your back." (R. at 545.) Lawson explained that the worst part about depression was that "[he could not] get excited about anything because [he knew] that [] [he was not] able to do the things that [he] enjoy[ed] that normal people do." (R. at 546.) Lawson estimated that he experienced this type of depression once or twice a week. (R. at 546.) He stated that sometimes it varied, whereby he may be depressed five times a week for about 15 minutes each time, or it may only be two or three days a week. (R. at 546.)

Lawson also stated that he experienced difficulty with concentration, to the point that he had difficulty maintaining attention while watching a 30 minute television show. (R. at 547.) Lawson testified that, upon watching television, he lost interest and could no longer "concentrate on what they were saying" after about 10 or 15 minutes. (R. at 547.) Lawson explained that his lack of concentration may have resulted from having "so much other stuff on [his] mind that it just takes over, and I [] don't pay attention to what's going on around me." (R. at 547.) Lawson testified that this

8

occurred about three or four times per week, and was prevalent when his blood sugar was low. (R. at 547.)

With regard to his medications, Lawson stated that the muscle relaxers and pain pills made him drowsy, but did not help him sleep. (R. at 548.) Lawson noted that he takes Glucophage, which raised or lowered his blood sugar, as well as another medication which helped his circulation. (R. at 548.) Lawson's counsel asked whether any doctor has told him in the past that, in their opinion, he could work, to which Lawson answered, Dr. Cassel of Clinch River Health Services told him he could not work. (R. at 549.)

The ALJ next began his inquiry, asking Lawson whether he drives, to which Lawson answered, "very little." (R. at 550.) In addition, Lawson was asked whether he reads, to which he answered, "I try to." (R. at 550.)

Donna Jean Bardsley, a vocational expert, also testified at Lawson's hearing. (R. at 551-553.) The ALJ asked Bardsley to consider a hypothetical claimant of the same age, education and past work experience as Lawson, who could work at a sedentary exertional level. (R. at 551.) In addition, the ALJ asked Bardsley to assume that the claimant was able to be on his feet four out of eight hours in a workday, sit six hours out of an eight-hour workday, lift 10 pounds frequently and 15 pounds occasionally, occasionally bend and squat and occasionally and frequently reach, handle, feel, grasp and finger. (R. at 551.) In addition, the ALJ imposed no visual or communicative limitations in his hypothetical. (R. at 551.) The ALJ also imposed

9

upon Lawson a global assessment of functioning, ("GAF"), score of 65.[2] (R. at 551.) The ALJ asked Bardsley to consider, based on the hypothetical presented by him, whether in her opinion a claimant could perform work that exists in the regional and national economy in reasonably numbers. (R. at 551.) Bardsley opined that such a claimant could perform work as a cashier, information clerk, order clerk, ticket seller, hand packager, sorter and some assemblers. (R. at 551-52.) Bardsley opined that there were 3,500 jobs regionally and four million jobs nationally. (R. at 552.)

The ALJ next asked Bardsley to consider the same hypothetical claimant with the same physical limitations. (R. at 552.) However, the ALJ asked Bardsley to consider a claimant who is seriously limited, but not precluded from dealing with the public and with work stresses. (R. at 552.) The ALJ noted that he was referring to Exhibit 3F, which also states that he is seriously limited, but not precluded from, demonstrating reliability. (R. at 552.) Bardsley opined that, based on the further restrictions, there would be some jobs remaining that claimant could perform, but she would eliminate those jobs dealing with the public. (R. at 552.) Bardsley opined that there would be about 1,800 jobs regionally that a claimant could perform based on the further restrictions, and these jobs would consist of hand packagers, sorters and assemblers. (R. at 552.) The ALJ placed further restrictions on his hypothetical, stating that the claimant would have pain where he could not be functional for 10

---

[2] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 61-70 indicates that the individual has "some mild symptoms or some difficulty in social, occupational, or school functioning." DSM-IV at 32.

Case 2:08-cv-00024-GMW-PMS   Document 18   Filed 01/29/09   Page 10 of 38   Pageid#: 67

percent of the regular workweek. (R. at 553.) Bardsley opined that based on these further restrictions, this would eliminate all potential jobs. (R. at 553.)

Lawson's counsel asked Bardsley whether someone who was unable to maintain concentration for more than about 10 minutes at a time without losing focus would be able to do the type of jobs she listed. (R. at 553.) Bardsley opined that, such a claimant would not be able to perform such jobs. (R. at 553.) Additionally, Lawson's counsel asked Bardsley whether someone who had to take six to eight breaks a day, each for five to 10 minutes at a time, would still be able to keep their job. (R. at 554.) Bardsley opined that based on the hypothetical, such a claimant would not be able to keep their job. (R. at 554.)

In rendering his decision, the ALJ reviewed records from Scott County Mental Health Center; Clinch River Health Services, ("Clinch River"); B. Wayne Lanthorn, Ph.D.; Dr. Chris Newell, M.D.; Donna Abbot, M.A.; Virginia Department of Rehabilitative Services; Eugenie Hamilton, Ph.D., a state agency psychologist; Sabrina Mitchell, F.N.P; Virginia Department of Social Services; and Lawson's attorney also submitted progress records from Clinch River dated March 23, 2006, through August 15, 2007, and a medication list dated July 23, 2006, through August 10, 2007, to the Appeals Council[3].

---

[3] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991.)

Case 2:08-cv-00024-GMW-PMS   Document 18   Filed 01/29/09   Page 11 of 38   Pageid#: 68

Following Lawson's alleged onset date of August 1, 2002, Lawson received treatment from Scott County Mental Health Center on four occasions from August 14, 2002, through November 5, 2002. (R. at 257-258, 301-302.) During these four appointments, Lawson complained of poor sleep and audio hallucinations. (R. at 302.) Lawson reported that his appetite was fair and that he was taking his required medications. (R. at 302.) On November 5, 2002, Lawson reported that he was "doing real good," and that he had experienced fewer hallucinations, noting that he felt as though his medication was working. (R. at 301.) The examining physician diagnosed Lawson with major depressive dissevere disorder with generalized anxiety. (R. at 301-305.) The physician also noted that Lawson complained of back pain. (R. at 301-305.)

On September 25, 2002, Lawson presented to the Virginia Department of Rehabilitative Services for consultative mental status evaluation performed by B. Wayne Lanthorn, Ph.D., and Donna Abbot, M.A. (R. at 289.) Lawson complained of anxiety attacks, nervousness and not being able to sleep at night. (R. at 289.) He stated that he had quit his last job in April 2001 because of problems with his back. (R. at 289.) Lawson stated his family physician was Dr. Cassel, and he had never been hospitalized. (R. at 289.) Although he had been taking medication prescribed by Scott County Mental Health Center, he was still unable to sleep at night. (R. at 289-90.) Lawson denied using alcohol or drugs, but stated that he smoked one and a half packs of cigarettes per day. (R. at 290.) He stated that he was hospitalized at for approximately five days in June 2001 due to depression and anxiety. (R. at 290.)

12

The examiners noted that Lawson was able to attend and concentrate, as well as follow directions and complete tasks. (R. at 291.) When asked about his hallucinations, Lawson described them as "a glimpse of something, people, in my room and the like, I've heard something in the other room." (R. at 291.) The examiners noted that Lawson had been evaluated by different persons, all of whom seemed to be perplexed regarding his hallucinations. (R. at 291.) The examiners noted that it was previously suggested that Lawson's hallucinations were possibly a result of his lack of sleep. (R. at 291.) Lawson's examiners noted that there were no overt signs of disordered thought processes or delusional thinking, and further noted that Lawson appeared to be rational and alert. (R. at 291.)

The examiners noted that Lawson described his routine day as "[he] gets up, fix[es] something to eat, clean[s] up around the house, watch[es] TV a little, listen[s] to the radio, do[es] dishes, fix[es] a little lunch, and read[s] a little. In the afternoon, [he] fix[es] the dinner, watch[es] TV, read[s], and go[es] to bed." (R. at 291.) He further stated that his mother did his laundry and most of the grocery shopping. (R. at 292.)

The examiners diagnosed Lawson with major depressive disorder, single episode without psychotic features, panic disorder with agoraphobia, in fair remission, self-reported back pain, with a GAF score of 60 to 65. (R. at 294.) They also noted that Vocational Rehabilitation would be an option if he continued to have back problems. (R. at 294.) Additionally, they recommended that Lawson continue his psychiatric treatment. (R. at 294.)

13

On this same date, Abbot performed a Medical Assessment of Ability to do Work-Related Activities (Mental), where she opined that Lawson had a good ability to maintain person appearance; a fair ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, function independently, maintain attention/concentration, understand, remember and carry out complex job instruction, behave in an emotionally stable manner and relate predictably in social situations; a poor ability to deal with the public, deal with work stresses and demonstrate reliability; and an unlimited ability to understand, remember and carry out detailed, but not complex instructions, as well as understand, remember and carry out simple job instructions. (R. at 296-97.)

From January 24, 2003, through August 3, 2005, Lawson was treated at Clinch River with complaints of chronic low back pain, depression, obesity, degenerative disc disease, possible lumbar stenosis, bilateral upper and lower extremity numbness, dizziness, blurred vision, lightheadedness, diabetes mellitus, hyperlipidemia, insomnia and hypertension. (R. at 389-413.) On July 25, 2003, Lawson presented to Clinch River with complaints of diarrhea, vomiting, fever and chills for the previous five days. (R. at 397.) Lawson reported a possible pulled muscle in his lower back, in addition to reports of pain radiating up towards his shoulders. (R. at 397.) The treating physician noted no trauma associated with the injury, but opined that the vomiting had exacerbated his condition. (R. at 397.) The treating physician diagnosed Lawson with viral gastroenteritis, in addition to low back pain, which was musculoskeletal in nature and probably a muscle spasm or pulled muscle due to the vomiting. (R. at 397.)

14

On March 19, 2004, Lawson returned to Clinch River with complaints of back pain, noting that he could no longer bend over and do anything. (R. at 396.) Lawson additionally stated that if he walked on his feet for 20 to 30 minutes, his legs became numb and achy, forcing him to sit down. (R. at 396.) The treating physician diagnosed Lawson with chronic low back pain, with possible degenerative disc disease, in addition to obesity, tobacco use and a history of depression. (R. at 396.) The treating physician prescribed Celebrex and Flexeril. (R. at 396.)

On April 12, 2004, Lawson returned to Clinch River reporting that he had been walking 15 minutes once or twice a day with no real improvement in his condition. (R. at 394.) Lawson also noted that the Celebrex and Flexeril did not seem to help. (R. at 394.) Lawson was diagnosed with low back pain, possibly lumbar stenosis. (R. at 394.) The treating physician opined that Lawson was in need of some studies, and the physician noted that he would send a letter stating that Lawson was unable to work, which Lawson would use to help apply for benefits. (R. at 394.)

On April 14, 2004, Dr. Todd A. Cassel, M.D., reported that Lawson's problems included major depression and degenerative disc disease, among other things, and with these problems, he opined that Lawson was unable to work. (R. at 395.) Dr. Cassel opined that more tests were needed to aid in defining the problems and to tailor therapy in the best way. (R. at 395.) He also noted that such tests were expensive and Lawson had no medical insurance. (R. at 395.)

15

On November 18, 2004, Lawson returned to Clinch River with copies of his blood sugar readings from November 2, 2004, which showed a range of 95 to 165. (R. at 393.) The physician stated that Lawson had been following a low cholesterol diet, and that he felt better since beginning the diet. (R. at 393.) Lawson was diagnosed with hyperlipidemia, and the physician recommended continued dietary control for NCS diet, and low cholesterol for his diabetes mellitus and elevated triglycerides. (R. at 393.)

On February 18, 2005, Lawson returned to Clinch River, reporting a blood sugar range of 130 to 150, but never over 200. (R. at 391.) Lawson also reported that he had a consistent backache, and he was able to function as long as he was not pushed too far. (R. at 391.) Lawson additionally requested medication to help him sleep. (R. at 391.) Lawson was diagnosed with diabetes mellitus, hypertension, insomnia and a disc bulge at L3-L4 and L4-L5. (R. at 391.)

On February 17, 2005, Lawson presented to the Virginia Department of Rehabilitative Services for a consultative mental status evaluation, performed by Lanthorn. (R. at 414.) Lanthorn observed that Lawson's teeth were in poor condition, with several upper teeth missing. (R. at 414.) Overall, Lanthorn stated that Lawson's appearance was fairly clean and neat. (R. at 414.) Lanthorn noted that Lawson complained of a herniated disc in his lower back and numbness in his legs. (R. at 415.) Additionally, Lawson told Lanthorn that he had been diagnosed with diabetes three months prior to his visit, stating that he also had a history of depression. (R. at 415.)

16

Lawson stated that his back problems began after high school when he pulled a muscle while working a job, noting that the injury worsened over time. (R. at 415.) Lawson stated that he has taken medication and been treated with physical therapy, but that the physical therapy made his condition worse. (R. at 415.) Lawson admitted that the next step would require surgery, however, he indicated that he was financially unable to do so. (R. at 415.) He also told Lanthorn that his leg became numb when the disc swelled and puts pressure on the nerve. (R. at 415.) Lawson further stated that he had never been hospitalized and he reported that he took over-the-counter pain relievers. (R. at 415.) Lawson denied alcohol or drug use, but admitted to smoking one pack of cigarettes a day. (R. at 415.)

Lanthorn noted that Lawson discussed that he had been treated at Frontier Health in the past, where they had tried him on several different medications, which worked for a short time, but no longer were effective. (R. at 415.) At one point, Lawson reported that he was taking eight or nine medications. (R. at 415.) Lawson reported that his last employment was with Carta-Mundi, where he was a shift supervisor. (R. at 416.) He stated that he last worked there three years prior to this visit, but had to leave because of depression and his back pain. (R. at 416.) He also stated that he could not concentrate and keep his mind on the job, and that he had trouble being around people. (R. at 416.)

Upon completing a mental status evaluation, Lanthorn noted that Lawson seemed appropriately oriented in all spheres, and his memory processes were intact. (R. at 416.) Lanthorn described his affect as appropriate and his eye contact as good.

17

(R. at 416.)  In addition, Lawson denied any hallucinations since discontinuing his medications.  (R. at 416.)  Lawson did report having vivid dreams, but there were no current over indicators of disordered thought processes or delusional thinking.  (R. at 416.)  Lanthorn opined that Lawson appeared to be rational and alert.  (R. at 416.)

Lawson told Lanthorn that he was applying for disability due to back pain, diabetes and depression.  (R. at 417.)  Lawson stated that he thought he had been depressed most of his life, explaining that it started once he hurt his back.  (R. at 417.)  Lawson also reported a history of panic attacks, explaining that when he had to go out to places where there are people he did not know, his heart rate increased and he had difficulty breathing.  (R. at 417.)  Lanthorn diagnosed Lawson with major depressive disorder, single episode, mild, as well as panic disorder with agoraphobia, back pain and diabetes, with a GAF of 65.  (R. at 418.)  Lanthorn opined that Lawson could attend and concentrate for short periods of time but may have some difficulty maintaining attention and concentration due to depression and anxiety.  (R. at 418.)  Lanthorn opined that Lawson's social interaction and general adaptation skills were fair, and he could work in close proximity to others without being distracted.  (R. at 418.)  Lanthorn did note that an increase in stress may exacerbate depression and panic anxiety symptoms.  (R. at 418.)

On March 5, 2005, Lawson presented to the Virginia Department of Rehabilitative Services for a consultative examination performed by Dr. Chris Newell, M.D.  (R. at 414.)  Lawson cited chronic lower back pain and diabetes as his chief complaints.  (R. at 420.)  Dr. Newell noted that Lawson was diagnosed with Type II

diabetes three months prior to his visit, and that his current blood sugar was 236. (R. at 421.) Lawson denied any lower extremity numbness and tingling. (R. at 421.) Dr. Newell reported that Lawson mostly stayed at home and was able to cook, clean, do dishes and read. (R. at 421.)

Upon completing a physical examination, Dr. Newell observed that Lawson was obese, but gave good effort on a strength test. (R. at 421.) Dr. Newell noted that Lawson appeared to be alert and oriented, and was able to recall recent and past events. (R. at 421.) Lawson's mood and affect were normal, as well as his general/gross mental status. (R. at 421-22.) Dr. Newell observed that Lawson had inspiratory wheezes on the right side, and that his heart had regular rate and rhythm. (R. at 421.) Upon examining Lawson's back, Dr. Newell noted tenderness to palpation in the midline from L1-S1, in addition to tenderness to the left at L3-S1. (R. at 422.) Lawson's upper extremity strength was reported as 5/5, while his lower right extremity was 5/5 and his lower left extremity was 4/5. (R. at 422.) Lawson was newly diagnosed with type II diabetes, as well as lumbargo, left sciatica. (R. at 423.) Dr. Newell opined that that Lawson was able to stand and walk for about four hours in an eight-hour workday, lift/carry 10 pounds frequently and 15 pounds occasionally, bend and/or squat occasionally and reach, handle, feel, grasp and finger occasionally and frequently. (R. at 423.)

On March 23, 2005, Lawson underwent a Physical Residual Functional Capacity, ("PRFC"), assessment. (R. at 426-431.) It was determined that Lawson could occasionally lift/carry items weighing up to 50 pounds; frequently lift/carry

19

items weighing up to 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and was unlimited in his ability to push/pull. (R. at 427.) No postural, manipulative, visual, communicative or environmental limitations were imposed on Lawson. (R. at 428-29.)

On this same date, Eugenie Hamilton, Ph.D., completed a Psychiatric Review Technique form, ("PRTF"). (R. at 432.) Hamilton found that Lawson's impairments were not severe, and such a medical disposition was based on the categories of affective disorders and anxiety-related disorders. (R. at 432.) Hamilton also found that Lawson had a medically determinable impairment consisting of major depressive disorder, single episode, mild, as well as panic disorder with agoraphobia. (R. at 435.) With regard to Lawson's functional limitations, Hamilton found a mild degree of limitation in the categories of restriction of activities of daily living, maintaining social functioning and concentration, persistence or pace. (R. at 442.) Additionally, Hamilton noted no episodes of decompensation. (R. at 442.)

Lawson continued treatment at Clinch River from June 23, 2005, through June 7, 2006. (R. at 445-468.) On June 23, 2005, Lawson presented to Clinch River with complaints of burning and itching of his feet, in addition to a spot on his left arm and let forehead. (R. at 458.) Lawson also had complaints of insomnia. (R. at 458.) Lawson was diagnosed with insomnia, peripheral neuropathy, diabetes mellitus and muscle spasms of the left neck. (R. at 458.) On August 3, 2005, Lawson presented to Clinch River for minor surgery to have a papule excised from his left forehead and left

forearm. (R. at 456.) The doctor's assessment noted a verucus like poss basal cell forehead and a benign nevus in appearance on the left forearm. (R. at 456.)

On August 17, 2005, Lawson presented to Clinch River for a routine medical check. (R. at 455.) Lawson indicated that he had been doing fairly well and trying to follow a diabetic diet. (R at 455.) It was noted that Lawson still complained of burning in his feet, as well as fluctuating blood sugars, insomnia and low back pain. (R. at 455.) An examination revealed tenderness to palpation at the lumbar area between L1 and extending down to the sacral area with vertebrae tenderness appreciated and decreased sensory perception at the bilateral lower extremities. (R. at 455.) Lawson was diagnosed with a disc bulge at L3-L4, L4-L5 with radiculopathy, diabetes mellitus, insomnia and hypertension. (R. at 455.)

On September 9, 2005, Lawson presented to Clinch River with complaints of body aches, chilling, head congestion and chest congestion, indicating he had sinus headaches that morning. (R. at 454.) He also indicated that his muscles had continued to be sore in the bilateral upper and lower extremities with myalgia. (R. at 454.) An examination revealed frontal and maxillary sinus tenderness appreciated with the maxillary area noted to be predominantly very tender. (R. at 454.) Lawson was diagnosed with sinusitis, bronchial spasms with possible bronchitis and myalgia. (R. at 454.) On September 12, 2005, Lawson presented to Clinch River complaining that he felt worse than he did before his previous visit. (R. at 453.) Lawson indicated soreness in his throat and mouth, as well as having a fever and headache. (R. at 453.)

Case 2:08-cv-00024-GMW-PMS   Document 18   Filed 01/29/09   Page 21 of 38   Pageid#: 78

He was diagnosed with sinusitis, oral ulcers, oral candida, GERD and insomnia. (R. at 453.)

On February 13, 2006, Lawson presented to Clinch River complaining of right hip pain, which worsened when he walked or stood. (R. at 450.) An examination revealed mild breakaway weakness at the right lower extremity secondary to right hip discomfort, point tenderness at the right greater trochanter bursa and mild tenderness at the right lumbosacral muscles with tenderness and tightness. (R. at 450.) Lawson was diagnosed with low back pain, right intertrochanteric bursitis, muscle spasms of the lumbosacral muscle, diabetes mellitus, hyperlipidemia and a history of disc bulge at L3-L4, L4-L5 with peripheral neuropathy. (R at 450.)

On March 10, 2006, Sabrina Mitchell, F.N.P., of the Virginia Department of Social Services, diagnosed Lawson with a disc bulge at L3-L4 and L4-L5, carpal tunnel syndrome, insomnia, diabetes mellitus and major depression. (R. at 449.) Mitchell opined that such a diagnosis rendered Lawson unable to work or severely limited his capacity for self-support for six months. (R. at 449.) Mitchell opined that Lawson had limitations on lifting, strenuous activity and over use of both hands. (R. at 449.) Mitchell recommended treatment to include anti-inflammatory treatment for joint discomfort, braces to both hands and intermittent steroid injections for inflammation. (R. at 449.)

On March 10, 2006, Lawson presented to Clinch River with complaints of chest pain and head congestion. (R. at 448.) Lawson was diagnosed with sinusitis and

22

bronchiolitis. (R. at 448.) On May 15, 2006, Lawson presented to Clinch River with complaints of increasing blood pressure over the previous four days. (R. at 446.) Lawson was diagnosed with hypertension, hyperlipidemia and hemorrhoids. (R. at 446.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national

23

economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated October 17, 2006, the ALJ denied Lawson's claims. (R. at 18-25.) The ALJ found that Lawson met the insured status requirements of the Act for DIB purposes through the date of decision. (R. at 23.) The ALJ also found that Lawson had not engaged in substantial gainful activity since August 1, 2002, the alleged onset date. (R. at 23.) The ALJ found that Lawson suffered from a severe back impairment, diabetes mellitus and obesity. (R. at 23.) The ALJ found, however, that Lawson did not have an impairment or combination of impairments that met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ found that Lawson retained the residual functional capacity to perform the exertional demands of a limited range of sedentary work. (R. at 24.) Thus, the ALJ found that Lawson could not perform his past relevant work as a construction worker or machine operator. (R. at 19.) Based on Lawson's age, education, work history, RFC and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the regional and national economies that Lawson could perform, including those of cashier, information clerk, order clerk, ticket seller, handle packager, sorter and assembler. (R. at 24.) Therefore, the ALJ concluded that Lawson was not under a disability as defined by the Act, and that he was not entitled to benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2008).

Case 2:08-cv-00024-GMW-PMS   Document 18   Filed 01/29/09   Page 24 of 38   Pageid#: 81

Lawson argues that the ALJ's RFC determination was not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8.) Specifically, Lawson argues that the ALJ failed to explain how the medical evidence supported his RFC assessment. (Plaintiff's Brief at 9.) Second, Lawson argues that substantial evidence does not support the findings by the ALJ regarding his mental impairments. (Plaintiff's Brief at 9-13.) Third, Lawson argues that the ALJ erred by not according proper weight to the opinion of Dr. Lanthorn, who provided a consultative mental status evaluation. (Plaintiff's Brief at 14.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the

weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Lawson first argues that the ALJ's RFC determination was not supported by substantial evidence. (Plaintiff's Brief at 8.)

In this case, after discussing the medical evidence of record and identifying the weight accorded to the medical source opinions, the ALJ asked the vocational expert, Ms. Bardsley,

> to assume a younger individual with a 12th grade education who could be on his feet four hours out of an eight-hour workday, sit for six hours in an eight-hour workday, lift and carry 10 pounds on a frequent basis and 15 pounds on an occasional basis, squat occasionally but not frequently, bend occasionally but not frequently, reach, handle, feel, grasp and finger occasionally and frequently, and no visual or communicative limitations, with a GAF of 65, and was asked if the[re] are a significant number of jobs such an individual could perform.

(R. at 22-23.) Ms. Bardsley stated that such an individual could perform jobs such as a cashier, information clerk, order clerk, ticket seller, hand packager, sorter and assembler, and that there were 3,500 of these jobs in the regional economy, and four million in the national economy. (R. at 23.)

26

Upon making an RFC determination, the ALJ stated that "the claimant retains the residual functional capacity as enumerated in my hypothetical question to the vocational expert, except that he does not have a severe impairment." (R. at 23.) This RFC assessment was later restated in the "Findings" section under paragraph five. (R. at 24.)

Lawson argues that the ALJ failed to explain how the medical evidence supports his RFC conclusion. (Plaintiff's Brief at 9.) One step used in social security disability determinations requires the ALJ to review the claimant's RFC and the physical demands of the claimant's past work. *See* 20 § C.F.R. 404.1520, 416.945. A claimant's RFC is "the most [a claimant] can still do despite [a claimant's] limitations," and an ALJ will assess a claimant's RFC "based on all the relevant evidence in [a claimant's] case." 20 § C.F.R. 404.1520, 416.945. Lawson argues that, although the ALJ made a reference to an RFC finding, the ALJ failed to comply with the narrative discussion requirements under Social Security Rule 96-8p, which states:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

27

SSR 96-8p. While it would appear that the ALJ omitted any specific discussion of the RFC finding, the ALJ nevertheless adopted his own language, which he posed to the vocational expert at the hearing. His question contained the relevant portions of discussion relating to an RFC finding, and rather than restating these restrictions, he simply chose to adopt his previously spoken words. The undersigned finds such an act to be harmless error. While this court does not want to set a precedent for ALJ's choosing to omit words by adopting prior statements, it is clear that the ALJ, in making his RFC determination, was referring to the restrictions set forth in his question to the vocational expert. He then adopted such restrictions and applied them to Lawson's ability to work in making the determination that Lawson was capable of performing a limited range of sedentary work. While such a practice is not encouraged, it will be concluded to constitute harmless error under the specific factual circumstances in this case.

Second, Lawson argues that substantial evidence does not support the findings by the ALJ regarding his mental impairments. (Plaintiff's Brief at 9-13.)

The evidence of record regarding Lawson's mental impairments is as follows. At the administrative hearing, Lawson testified that he had experienced issues with anxiety and panic. (R. at 543.) He noted that his anxiety and depression worsened when he discovered all of his medical ailments, such as his problems with his kidneys, liver, blood pressure and cholesterol. (R. at 543.) He stated that not being able to work due to his back pain was depressing enough, but all of his other ailments on top

of that made his depression much worse.  (R. at 544.)  Lawson explained that he did not like crowds, and whenever he experienced a panic attack, he wanted to be alone in his room.  (R. at 544.)  Lawson stated that his panic attacks prevented him from "get[ting] out a whole lot," noting that he went out "maybe once a week."  (R. at 545.)  Lawson stated that his symptoms during a panic attack consisted of stomach sickness, nervousness, sweating and sometimes headaches.  (R. at 545.)

When asked to explain his depression in his own words, Lawson stated that he was "down on [himself]" and mad at himself "because [he] can't get out and do the things that [he] would like to do."  (R. at 545.)  Lawson explained that the worst part about depression was that "[he could not] get excited about anything because [he knew] that [] [he was not] able to do the things that [he] enjoy[ed] that normal people do."  (R. at 546.)  Lawson estimated that he experienced this type of depression once or twice a week.  (R. at 546.)  He stated that sometimes it varied, whereby he may be depressed five times a week for about 15 minutes each time, or it may only be two or three days a week.  (R. at 546.)

On September 25, 2002, Lawson presented to the Virginia Department of Rehabilitative Services for a consultative mental status evaluation, which was conducted by Lanthorn and Ms. Abbot.  (R. at 289.)  Lawson complained of anxiety attacks, nervousness and not being able to sleep at night.  (R. at 289.)  The examiners noted that Lawson was able to attend and concentrate, as well as follow directions and complete tasks.  (R. at 291.)  When asked about his hallucinations, Lawson described them as "a glimpse of something, people, in my room and the like, I've heard

something in the other room." (R. at 291.) Lawson's examiners noted that there were no overt signs of disordered thought processes or delusional thinking, and further noted that Lawson appeared to be rational and alert. (R. at 291.)

The examiners diagnosed Lawson with major depressive disorder, single episode without psychotic features, panic disorder with agoraphobia, in fair remission, self-reported back pain, with a GAF score of 60 to 65. (R. at 294.) Additionally, they recommended that Lawson continue his psychiatric treatment. (R. at 294.)

On this same date, Ms. Abbot performed a Medical Assessment of Ability to do Work-Related Activities (Mental), where she opined that Lawson had a good ability to maintain person appearance; a fair ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, function independently, maintain attention/concentration, understand, remember and carry out complex job instruction, behave in an emotionally stable manner and relate predictably in social situations; a poor ability to deal with the public, deal with work stresses and demonstrate reliability; and an unlimited ability to understand, remember and carry out detailed, but not complex instructions, as well as understand, remember and carry out simple job instructions. (R. at 296-97.)

On April 14, 2004, Dr. Cassel reported that Lawson's problems included major depression and degenerative disc disease, among other things, and with these problems, he opined that Lawson was unable to work. (R. at 395.) Dr. Cassel opined that more

tests were needed to aid in defining the problems and to tailor therapy in the best way. (R. at 395.)

On February 17, 2005, Lawson presented to the Virginia Department of Rehabilitative Services for another consultative mental status evaluation, which was again conducted by Lanthorn. (R. at 414.) Upon completing a mental status evaluation, Lanthorn noted that Lawson seemed appropriately oriented in all spheres, and his memory processes were intact. (R. at 416.) Lanthorn described Lawson's affect as appropriate and his eye contact as good. (R. at 416.) In addition, Lawson denied any hallucinations since discontinuing his medications. (R. at 416.) Lawson did report having vivid dreams, but there were no current over indicators of disordered thought processes or delusional thinking. (R. at 416.) Lanthorn opined that Lawson appeared to be rational and alert. (R. at 416.)

Lanthorn diagnosed Lawson with major depressive disorder, single episode, mild, as well as panic disorder with agoraphobia, back pain and diabetes, with a GAF of 65. (R. at 418.) Lanthorn opined that Lawson could attend and concentrate for short periods of time but could have some difficulty maintaining attention and concentration due to depression and anxiety. (R. at 418.) Lanthorn opined that Lawson's social interaction and general adaptation skills were fair, and he could work in close proximity to others without being distracted. (R. at 418.) Lanthorn did note that an increase in stress could exacerbate depression and panic anxiety symptoms. (R. at 418.)

31

On March 23, 2005, Lawson underwent a Psychiatric Review Technique by Hamilton. (R. at 432.) Hamilton found that Lawson's impairments were not severe, and such a medical disposition was based on the categories of affective disorders and anxiety-related disorders. (R. at 432.) Hamilton also found that Lawson had a medically determinable impairment consisting of major depressive disorder, single episode, mild, as well as panic disorder with agoraphobia. (R. at 435.)

On March 10, 2006, Ms. Mitchell, of the Virginia Department of Social Services, diagnosed Lawson with, among other things, insomnia and major depression. (R. at 449.) Ms. Mitchell opined that such a diagnosis rendered Lawson unable to work or severely limited his capacity for self-support for six months. (R. at 449.)

The record shows that Lawson did not allege a disability due to depression in his application for disability. (R. at 346-355.) Rather, in his application for disability, which he completed on April 7, 2006, Lawson spoke primarily of his physical limitations, stating that he is "unable to stand or walk for very long," and "unable to sit [for] very long." (R. 347.) In addition, he stated that he has "numbness in [his] legs and swelling in [his] back." (R. at 347.) Lawson also claimed that he has a "stabbing pain in [his] back and legs." (R. at 347.)

During the relevant time period of Lawson's claim, from August 1, 2002, through October 17, 2006, he underwent mental health treatment four times, from August 14, 2002, to November 5, 2002, at Scott County Mental Health Center. (R. at 257-258, 301-302.) After these visits, the record does not show that Lawson

underwent any additional mental health treatment. In addition, it does not appear from the record that Lawson had taken any medications for his mental condition since his last visit to Scott County Mental Health Center on November 5, 2002, nearly four years prior to filing his application for disability. (R. at 301.) At an examination by Lanthorn on February 18, 2005, it was noted that Lawson was "not currently taking any medication for his anxiety and depressive symptoms," and that "Lawson report[ed] some reluctance to become involved in psychiatric treatment once again." (R. at 418.) Lawson also indicated that he voluntarily took himself off medication, stating that he "decided to wean himself off of the medications." (R. at 415.)

Although several medical records note that Lawson suffered from depression, the ALJ was correct in finding that such diagnoses did not provide substantial evidence to support a finding of a severe mental impairment. In support of his argument for a finding of a severe mental impairment, Lawson cited medical records from Scott County Mental Health Center from May 6, 2002, through December 2, 2002, which he states shows that he carried "the diagnoses of major depressive disorder, recurrent severe with psychotic features, and generalized anxiety disorder, with a GAF of 40." (Plaintiff's Brief at 10.) The undersigned would like to note that a majority of the records cited by Lawson occurred prior to his alleged onset date of August 1, 2002, and are therefore not relevant to his current determination of disability. Furthermore, more recent records show a significant improvement in Lawson's GAF.

Additionally, the four visits to Scott County Mental Health Center that occurred after the alleged onset date did not indicate a serious mental impairment. (R. at 257-

33

258, 301-302.) During these four appointments, Lawson complained of poor sleep and audio hallucinations. (R. at 302.) Lawson reported that his appetite was fair and that he was taking his required medications. (R. at 302.) On November 5, 2002, Lawson reported that he was "doing real good," and that his hallucinations had diminished and the he felt as though his medication was working. (R. at 301.) The examining physician diagnosed Lawson with "major depressive dissevere with generalized anxiety" at each visit. (R. at 301-305.) The fact that Lawson's depression was diagnosed as "dissevere" supports the ALJ in not finding a severe mental impairment. Lawson also cites to medical records from Scott County Mental Health Center from July 26, 2002, through July 30, 2002. (Plaintiff's Brief at 11.) The undersigned notes that such records are dated prior to the alleged onset date and are thus not relevant to his current determination of disability.

Lawson cites medical records from Clinch River and Dr. Cassel that diagnosed him with major depression. (Plaintiff's Brief at 11.) With regard to Dr. Cassel's finding on April 13, 2004, where he opined that Lawson's problems included major depression, the ALJ was correct to determine that this assessment was not supported by any objective finding. At the time Dr. Cassel rendered this assessment, it had been almost one year since Lawson had received any consistent treatment from Clinch River, with Lawson receiving no treatment from July 25, 2003, to March 19, 2004. (R. at 394-97.) In addition, the records from Clinch River, upon which Dr. Cassel primarily based his assessment, predominantly discuss Lawson's physical ailments, and only reference "a history of depression" in their diagnoses. (R. at 396.)

34

Lawson argues that a report by Ms. Mitchell provides substantial evidence to support a finding of a severe mental impairment. (Plaintiff's Brief at 11.) On March 10, 2006, Ms. Mitchell, of the Virginia Department of Social Services, diagnosed Lawson with disc bulge at L3-L4 and L4-L5, carpal tunnel syndrome, insomnia, diabetes mellitus and major depression. (R. at 449.) Mitchell opined that such a diagnosis rendered Lawson unable to work or severely limited his capacity for self-support for six months. (R. at 449.) Although the ALJ failed to even mention Ms. Mitchell's diagnoses in his opinion, he was not required to under the regulations due to the fact that this was a medical report rendered in connection with Lawson's application for state welfare. The regulations state:

> A decision by any nongovernmental agency or any other government agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

20 C.F.R §§ 404.1504, 416.904. Therefore, the ALJ was not required to consider the opinion of Ms. Mitchell as it was made in connection with another government agency.

Third, Lawson argues that the ALJ erred by not according proper weight to the opinion of Lanthorn, who provided a consultative mental status evaluation. (Plaintiff's Brief at 14.)

The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of

35

the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[4] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

As previously stated, Lanthorn diagnosed Lawson with major depressive disorder, single episode, mild, as well as panic disorder with agoraphobia, back pain and diabetes, with a GAF of 65. (R. at 418.) The ALJ found that Lanthorn's diagnosis was not only inconsistent with his own objective observations, but inconsistent with the rest of the objective medical evidence of record. (R. at 21.) The undersigned agrees with the ALJ's assessment to accord lesser weight to the opinion of Lanthorn as it was inconsistent with the record previously discussed. Lanthorn opined that Lawson could attend and concentrate for short periods of time but could have some difficulty maintaining attention and concentration due to depression and anxiety. (R. at 418.) Lanthorn opined that Lawson's social interaction and general adaptation skills were

---

[4] *Hunter* was superseded by 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which states, in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

36

fair, and that he could work in close proximity to others without being distracted. (R. at 418.) Lanthorn did note that an increase in stress could have exacerbated depression and panic anxiety symptoms. (R. at 418.)

The records from Clinch River primarily discuss Lawson's physical ailments, and only reference "a history of depression" in their diagnoses. (R. at 396.) Additionally, the four visits to Scott County Mental Health Center that occurred after the alleged onset date did not indicate a serious mental impairment. (R. at 257-258, 301-302.) It should also be noted that a few months after Lawson's visit with Lanthorn, Hamilton, a state agency psychologist, also found that Lawson had a medically determinable impairment consisting of major depressive disorder, single episode, mild, as well as panic disorder with agoraphobia. However, Hamilton opined that this was not a severe medical impairment. This evidence of record, combined with the fact that Lawson did not allege a mental impairment in his disability application, that Lawson received no mental health treatment since November 5, 2002, and that Lawson voluntarily took himself off of his medication, shows that Lanthorn's diagnosis of depression was inconsistent with the evidence of record, and was properly accorded lesser weight.

*IV. Conclusion*

For the foregoing reasons, I will grant the Commissioner's motion for summary judgment and deny Lawson's motion for summary judgment.

37

An appropriate order will be entered.

**ENTER:** This ___29ᵗʰ___ day of January, 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE